**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NORFOLK SHIPBUILDING & DRYDOCK
CORPORATION,
Petitioner,

v.

THEODORE FAULK; DIRECTOR, OFFICE

OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR; NEWPORT
NEWS SHIPBUILDING AND DRY DOCK
COMPANY,
Respondents.

No. 99-1755

On Petition for Review of an Order of the
Benefits Review Board.
(98-1128)

Argued: April 6, 2000

Decided: July 11, 2000

Before WILKINS and MICHAEL, Circuit Judges, and Patrick M.
DUFFY, United States District Judge for the District of South
Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Gerard E.W. Voyer, TAYLOR & WALKER, Norfolk,
Virginia, for Petitioner. Benjamin McMullan Mason, MASON,

COWARDIN & MASON, Newport News, Virginia, for Respondent Newport News Shipbuilding; Kristin Marie Dadey, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director; Gary Richard West, PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C., Newport News, Virginia, for Respondent Faulk. **ON BRIEF:** Donna White Kearney, TAYLOR & WALKER, Norfolk, Virginia, for Petitioner. Lexine D. Walker, MASON, COWARDIN & MASON, Newport News, Virginia, for Respondent Newport News Shipbuilding. Henry L. Solano, Solicitor of Labor, Carol A. De Deo, Associate Solicitor for Employee Benefits, Samuel J. Oshinsky, Counsel for Longshore, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Norfolk Shipbuilding & DryDock Corporation ("Norshipco") petitions for review of the order of the Benefits Review Board of the Department of Labor ("Board") affirming the administrative law judge's ("ALJ") order finding Norshipco the responsible employer and awarding permanent total disability benefits to Theodore R. Faulk for asbestos-related peritoneal mesothelioma under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C.A. §§ 901-950 (West 1986 & Supp. 1999). We have jurisdiction under section 21(c) of the LHWCA to review final orders of the Board for injuries occurring in states within the circuit. 33 U.S.C. § 921(c).

I.

We review Board decisions for errors of law and for adherence to the statutory standard governing the ALJ's factual findings. See New-

2

port News Shipbuilding and Dry Dock Co. v. Director, OWCP (Harcum), 131 F.3d 1079, 1081 (4th Cir. 1997); 33 U.S.C. § 921 (b)(3). Section 21(b)(3) of the LHWCA directs that "[t]he findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3). To determine whether the Board complied with the standard, the Court of Appeals conducts an independent review of the administrative record. Bumble Bee Seafoods v. Director, OWCP (Hanson), 629 F.2d 1327, 1329 (9th Cir. 1980). Like the Board, the Court of Appeals will uphold the factual findings of the ALJ so long as they are supported by substantial evidence, and it will not disregard these findings merely "on the basis that other inferences might have been more reasonable." Director, OWCP v. Newport News Shipbuilding & Dry Dock Co. (Carmines), 138 F.3d 134, 140 (4th Cir. 1998). Review of factual findings is limited, and "[d]eference must be given the fact-finder's inferences and credibility assessments." Id. (quoting Newport News Shipbuilding and Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir.1988)). Nevertheless, to be sufficient, the evidence must be "more than a scintilla but less than a preponderance," Elliott v. Administrator, Animal & Plant Health Inspection Serv., 990 F.2d 140, 144 (4th Cir. 1993), and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmines, 138 F.3d at 140 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The ALJ may not "merely credulously accept the assertions of the parties or their representatives, but must examine the logic of their conclusions and evaluate the evidence upon which their conclusions are based." Carmines, 138 F.3d at 140.

II.

Theodore R. Faulk was employed by Norshipco as a shipfitter from November 29, 1978 until November 27, 1996. Prior to his employment at Norshipco, Faulk spent almost six years constructing and repairing ships at Newport News Shipbuilding and Dry Dock Company ("NNS"). On November 27, 1996, Faulk was diagnosed with peritoneal mesothelioma, caused, at least in part, by his exposure to airborne asbestos dust and fibers. Faulk has a permanent and total disability which is deemed to have begun on November 27, 1996 and is continuing as a result of the mesothelioma.

3

Faulk testified that he was certain that he was exposed to asbestos while employed at NNS as a shipfitter. He cut asbestos cloth and used it to cover himself and other surfaces as protection from welding fire. Cutting and moving the cloth created visible dust and particles. He also worked around insulators and welders who used asbestos materials. Faulk rarely wore a respirator while at NNS. NNS does not deny Faulk's exposure and did not present any contradictory evidence.

With respect to his employment at Norshipco, Faulk testified that he could not state with certainty that he was exposed to asbestos except for the time he worked aboard the U.S.S. Flint when Norshipco informed him of the presence of asbestos. The incident on the U.S.S. Flint occurred in October or November of 1996 when workers ruptured the insulation around a pipe covering when they hit it with the sharp edge of a bulkhead. Faulk had worked in and around the compartment for days, but was not present during the rupture. Regarding the incident, Faulk recalled, "I came in right after that had happened, and they told me what had happened, so I got my tools, and I got out of the room until they came in to test it to see what was wrong, see what kind of material it was." J.A. at 728. He estimated that it took him five minutes to pick up his tools. Later that day, Faulk returned to put his tools back in the compartment where he was storing them. After the rupture, Norshipco had someone come and test the material. The night crew fixed the torn area but did not remove all the asbestos from the pipe. Faulk described the compartment after the rupture as follows: "It wasn't real dusty, or nothing in there. It was just normal like it always been. You couldn't tell nothing had happened." J.A. at 720.

Faulk testified that he had used a respirator when he was in the compartment on the day of the rupture but that he had not "constantly" used a respirator while working aboard the ship. Although he was not in the compartment during the rupture, the record is unclear about where he was or how far away he was from the compartment, or if it was completely sealed at the time of the rupture. Faulk was not wearing a respirator when the pipe ruptured.

Faulk also stated that he was "sure" that he had been on many ships with asbestos at Norshipco. He was able to point specifically to the U.S.S. Briscoe, the U.S.S. Coronado, the U.S.S. Detroit, and the

4

U.S.S. Josephus Daniels as ships he worked on while at Norshipco, although he claimed no actual knowledge of asbestos on those ships. His job as a shipfitter encompassed removing and replacing bent steel, removing and installing foundations, and removing flooring to reach the steel deck for renovation. Although he could not remember the specific jobs he performed or the length of time he spent on each ship, he recalled working in the engine room of two ships which housed boilers generally insulated with asbestos materials. However, Faulk could not recall whether the insulation was being torn off while he was working on each respective ship.

In addition to his work, Faulk was present in ship compartments when other tradesmen such as insulators, tore off old insulation before they covered pipes or put insulation on walls. He was frequently around insulators as they removed insulation on Navy ships to complete repair work. Faulk also removed tile flooring with a chipping hammer. This type of work generates a great deal of dust and trash as the concrete under the tile is chipped away. It was not until November of 1996 that Faulk became aware that some of the flooring material contained asbestos. Because repair work generates considerably more dust and smoke than new construction work, he wore a respirator during his employment at Norshipco as early as 1978. Faulk testified that he took it upon himself to wear a respirator because Norshipco "did not have a good ventilation system on these jobs. . . they [were] very slack in . . . ventilating the area, getting the smoke out." J.A. at 49. While he wore a respirator a majority of the time, he did not "walk around eight hours a day with a respirator on." J.A. at 72. In his deposition, Faulk stated that he did not always wear a respirator when the tile floors were being torn up and the insulation was torn off. J.A. at 724. Faulk described the respirators as rubber with double filters on each side that fit over the nose and under the mouth. He would use it for a few days and then exchange it for a clean one. He sometimes also used paper-type disposable respirators depending on the type of work.

Faulk recalled times when Norshipco closed off an area to its employees while asbestos was being removed, but he was unsure whether they took these measures all the time or when he first arrived in 1978. He could not state with a certainty that the dust from the

5

Norshipco jobs contained asbestos, because he "didn't have anything tested." J.A. at 65.

NNS presented the testimony of Daniel Harrington, a certified industrial hygienist at NNS, for his conclusion that Faulk was exposed to asbestos on two naval ships at Norshipco. While Harrington was not directly responsible for NNS's asbestos program, he testified that he had "extensive experience" with asbestos. J.A. at 87. Harrington explained that asbestos was commonly used in thermal insulation systems, cloth, gaskets, floor tiles, underlayment, adhesive glue or cement, friction materials, and a variety of tapes. He testified that prior to 1971, Navy ships used asbestos "almost exclusively" on thermal insulation systems. J.A. 90, 100-01. While he had no access to specific ship specifications, he based this statement on the reference book The Naval Ships Technical Manual, a Department of Defense document. Harrington also relied upon Jayne's Fighting Ships to determine that two of the ships on which Faulk worked, the Josephus Daniels and the Coronado, had been built prior to 1971. From that, Harrington concluded that Faulk was exposed to asbestos at Norshipco. Harrington admitted that he did not research the ships' histories to learn of every overhaul or repair and conceded that it might be possible that the ships were repaired, removing the asbestos prior to their arrival at Norshipco. However, he did state that he had not seen any projects where NNS was asked to remove all the asbestos from a ship; instead, the Navy's standard procedure was to remove what was necessary to complete a job without disturbing the rest.

Harrington also acknowledged that NNS used asbestos extensively prior to his arrival in 1979 and that it was possible Faulk was exposed to asbestos at NNS. Since Harrington's employment, the bulk of NNS's asbestos work has involved removal and replacement with non-asbestos materials. NNS has used asbestos-free material in new construction and repair at least since 1979. The Naval Ships Technical Manual also noted that since 1974 most thermal insulation had been repaired with asbestos-free materials. Harrington further testified that there is no risk of exposure if the asbestos-containing materials are not disturbed and are in a well-maintained condition.

Norshipco presented the medical expert testimony of Dr. Paul Fairman, a pulmonary disease specialist at the Medical College of Vir-

6

ginia. He explained that peritoneal mesothelioma generally develops 35-40 years after the initial exposure and that it is extremely rare for it to develop in less than 20 years. Dr. Fairman reviewed Faulk's medical records, deposition testimony, and interrogatory answers, and opined that any exposure to asbestos aboard the U.S.S. Flint did not cause Faulk's mesothelioma, but that it was caused by the inhalation of asbestos at NNS.

After the hearing, the ALJ made extensive findings of fact. In his decision, the ALJ found "that the weight of the credible evidence establishes that Claimant was exposed to asbestos while working at Norshipco." J.A. at 764. In reaching his decision, he found Faulk to be "a very credible witness" and detailed the facts supporting exposure. Id. For instance, the ALJ noted that Faulk stored his tools in the U.S.S. Flint compartment where the insulation rupture occurred; that he worked in and around the compartment for days; that he entered the compartment twice after the rupture; that there was no evidence that the compartment was sealed off before or after the rupture; that he wore a respirator while in the compartment but had not continuously worn one while working around the compartment before, during, and after the rupture; that Faulk did not wear his respirator for the entire eight hour shift; that Dr. Steinberg noted that asbestos exposure can occur when protective clothing is not worn; and that Faulk did not wear protective clothing during his years of employment. Moreover, he found that Norshipco offered no evidence to contradict Faulk's assertions that he was exposed to asbestos while aboard the U.S.S. Flint. He also noted that Harrington's credible testimony helped "to generally buttress Claimant's testimony that he may well have been exposed to asbestos at other times while performing repair work at Norshipco on various Navy ships from 1978-1996." J.A. at 764. Nonetheless, the ALJ limited his finding to exposure on the U.S.S. Flint.

On appeal, the Board emphasized the ALJ's determination that Faulk was a very credible witness. In determining that credible evidence supported the ALJ's decision, the Board noted that,

> Claimant testified that, while he believed he may have worked on many ships exposing him to asbestos at Norfolk, he could recall only one incident of confirmed exposure to

7

asbestos, which occurred aboard the U.S.S. FLINT, when pipe insulation ruptured in a particular compartment where he worked; claimant testified he entered this area twice following the rupture to pick up and return tools. Claimant stated that he wore a respirator on the day he learned of the presence of asbestos, but had not been wearing a respirator at the time the rupture occurred. The [ALJ] further reasoned that the credible testimony of Mr. Harrington, an industrial hygienist at Newport News, generally buttresses claimant's testimony that he may have been exposed to asbestos at other times while performing repair work at Norfolk on various Navy ships. According to Mr. Harrington, based on the Naval Ship's Technical Manual, § 635-10.8 (1st rev. May 15, 1986), ships built prior to 1971 used asbestos for thermal insulation. Mr. Harrington confirmed that two of the ships on which claimant worked at Norfolk were built before 1971.

J.A. at 774-75 (citations and footnotes omitted). As a result, the Board affirmed.

III.

It is undisputed that asbestos exposure caused Faulk's peritoneal mesothelioma. The sole issue is the identity of the employer responsible for the exposure under the LHWCA. The last employer rule, which controls the allocation of liability among multiple employers or carriers in occupational disease cases, was set forth in Traveler's Ins. Co. v. Cardillo, 225 F.2d 137, 145 (2d Cir. 1955), and has been followed by many circuits. See e.g., Liberty Mutual Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 752 (1st Cir. 1992); Avondale Indus., Inc. v. Director, OWCP (Cuevas), 977 F.2d 186, 190 (5th Cir. 1992); Port of Portland v. Director, OWCP, 932 F.2d 836, 840 (9th Cir. 1991); see also Newport News Shipbuilding and Dry Dock v. Fishel, 694 F.2d 327, 329 n.2 (4th Cir. 1982) (explaining the last employer rule but finding instead that the aggravation rule was applicable to the given facts). In Cardillo, the Second Circuit held that:

the employer during the last employment in which the claimant was exposed to injurious stimuli, prior to the date

8

upon which the claimant became aware of the fact that he was suffering from an occupational disease arising naturally out of his employment, should be liable for the full amount of the award.

Cardillo, 225 F.2d at 145.

In adopting the rule, the Second Circuit noted that it was meant to avoid the difficulties and delays in administration of the Act that would result if courts attempted to apportion liability. Cardillo, 225 F.2d at 145. The court recognized the practical difficulties of apportionment stating,

> The nature of occupational diseases and the dearth of medical certainty with respect to the time that is required for them to develop and the permanence and extent of the resultant injurious effects at different stages of the diseases' evolution, make it exceedingly difficult, if not practically impossible, to correlate the progression of the disease with specific points in time or specific industrial experiences.

Id. at 144. While Norshipco "accepts the validity" of the Cardillo holding, it argues that NNS was the last employer to expose Faulk to injurious stimuli, and is therefore liable for benefits under the LHWCA. Norshipco challenges the ALJ's findings and conclusions by suggesting that NNS had the burden of proof and did not meet it; that the ALJ's findings were not based on substantial evidence; and that even if Faulk were considered exposed at Norshipco, Norshipco rebutted the presumption of liability.

Under the LHWCA, an employee is benefitted by a statutory presumption of compensability. Section 20(a) provides that "in any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary, that the claim comes within the provisions of this chapter." 33 U.S.C. § 920(a). "The presumption is a broad one, and advances the facility with which claims are to be treated to further the Act's purpose of compensating injured workers regardless of fault." Universal Maritime Corp. v. Moore, 126 F.3d 256, 262 (4th Cir. 1997).

9

The application of this presumption has resulted in a burden shifting scheme of proof for liability determinations."An employee seeking to have the benefit of the statutory presumption must first allege (1) an injury or death (2) that arose out of and in the course of (3) his maritime employment." Id.[1] Once the employee makes this showing, the burden shifts to the employer, who must rebut the presumption with substantial evidence. See id. In order to rebut this presumption, the employer must prove that the exposure was not injurious or that the employee was exposed to injurious stimuli while performing work covered by the LHWCA for a subsequent employer. See Avondale Indus. (Cuevas), 977 F.3d at 190. An injurious exposure is one which had the potential to cause the disease or harm at issue. See id.; see also Todd Pacific Shipyards Corp. v. Director, OWCP (Picinich), 914 F.2d 1317, 1320 (9th Cir. 1990) (requiring proof that exposure has the potential to cause the harm).

This presumption and resulting burden shifting apply two-fold in this case. First, it applies to NNS as Faulk's former employer. In that case, once Faulk established entitlement to the presumption, the burden shifts to NNS to rebut that presumption by showing either that the exposure did not have the potential to cause the harm or that Faulk was exposed to injurious stimuli with such potential while working for a subsequent employer.

While the ultimate conclusion, that Norshipco was the last responsible employer, is supported by substantial evidence, the ALJ's conclusion that NNS rebutted the presumption against it by establishing that Faulk was exposed subsequently at Norshipco was in error. In order for NNS to relieve itself of liability and foist liability on Norshipco, NNS must have proved that the U.S.S. Flint exposure had the potential to cause Faulk's disease. This, NNS failed to do. Evidence that the exposure simply occurred is not enough.

_____

**1** The Director questions the showing required for a claimant to establish his initial entitlement to the section 20(a) presumption of compensability. We, however, decline to address this issue because regardless of whether a claimant need only file a sufficient claim or make some evidentiary showing, Faulk did both.

10

The alternative application of the presumption would apply directly to Norshipco. In that case, once Faulk established that he was entitled to the presumption in regard to his employment at Norshipco, the burden shifted to Norshipco to establish that such exposure did not have the potential to cause the disease <u>or</u> that Faulk was exposed to stimuli which had the potential to cause the disease while performing work for a subsequent employer. As Faulk had no employer subsequent to Norshipco, the only way in which Norshipco could have rebutted the presumption of compensability would have been to establish that Faulk's exposure, while working for Norshipco, did not have the potential to cause the harm. Recognizing the suitability of this analysis to Faulk's claim, the Board affirmed the ALJ's ultimate decision on the reasoning that Norshipco had failed to meet this burden.[2]

This court reviews the Board for errors in law and to assure that the Board adhered to the substantial evidence standard when it reviewed the decision of the ALJ. <u>See Newport News Shipbuilding and Dry Dock Co. v. Director, OWCP (Harcum)</u>, 131 F.3d 1079, 1081 (4th Cir. 1997). The LHWCA mandates that an ALJ's findings be conclusive if they are supported by substantial evidence on the record as a whole. 33 U.S.C. § 921(b)(3). Rejecting the ALJ's conclusion that Faulk was sufficiently exposed aboard the U.S.S. <u>Flint</u>, Norshipco asserts that it did not expose Faulk to injurious stimuli at all. It argues that because Faulk was not present when the pipe ruptured, he entered the compartment for only five minutes and was wearing a respirator, the space was not dusty, and the rupture was repaired that night, ergo he was not exposed. As a result, Norshipco concludes that "the record is devoid of any evidence of exposure to airborne particles." Appellant's Br. at 24.

The Board affirmed the ALJ noting his authority to evaluate the evidence and assess witness credibility. Granted, the Board could have shown more care in selecting the facts for its opinion. For exam-

─────────────────────────────────────────────

[2] Norshipco argues that the presumption's applicability to it, as opposed to NNS, is not preserved for appeal because the issue was not raised below. However, Faulk filed his claim for benefits against each employer. And, as noted, <u>infra</u>, the Board based its decision affirming the award on the presumption's applicability to Norshipco. Accordingly, we have the authority to review the Board's legal reasoning.

11

ple, it mentions that Faulk was not wearing a respirator during the rupture but fails to include that he was not present. However, this omission does not indicate that the Board failed to adhere to the standard. Norshipco also takes issue with the Board's reference to Harrington's testimony about Faulk's career exposure, implying that the Board improperly disregarded the ALJ's decision to limit exposure to only the U.S.S. Flint. This reference is nothing more than an indication that the Board reviewed the ALJ's decision on the record as a whole.

Like the Board, we must affirm if the findings are supported by substantial evidence. In its appeal, Norshipco focuses on Faulk's time in the compartment, emphasizing its brevity and his use of a respirator. The ALJ acknowledged these points but noted that Faulk had worked in and around the compartment for days. In particular, the ALJ found that there was no evidence that the compartment was closed off before or after the rupture. He also found that Faulk had not worn a respirator constantly while working around the area on the day of the accident. Moreover, Faulk was twice permitted to enter the area after the rupture to pick up and return his tools. In making these findings, the ALJ weighed and commented on the credibility of the various witnesses. The facts he relied upon are supported by the record, and his inferences are reasonable. This court must defer to the fact-finder's credibility assessments and inferences. Carmines, 138 F.3d at 140. A review of the record indicates that the ALJ appropriately examined the logic of the parties' conclusions and evaluated the evidence. Id. He asked relevant questions of the witnesses and did not find exposure in every instance presented by Faulk.

Despite this deference, the evidence must still be sufficient- more than a scintilla but less than a preponderance. Elliott, 990 F.2d at 144. Norshipco relies upon the absence of visible dust after the rupture and Harrington's testimony that undisturbed asbestos is not a threat. These two facts, however, fail to mandate the inference that there was no injurious exposure aboard the U.S.S. Flint. Furthermore, witnesses described repair work and the Norshipco environment as very dusty, even though Faulk testified that after the rupture"it wasn't real dusty, or nothing in there. It was just normal like it always been. You couldn't tell nothing had happened." J.A. at 720. The record and the witness testimony appear to be of the kind that a reasonable mind

12

could accept to support an adequate conclusion. Basically, Norshipco asks this court to draw different inferences from the facts. The case law is clear that this court cannot disregard an ALJ's findings "on the basis that other inferences might have been more reasonable." Carmines, 138 F.3d at 140.

Norshipco argues alternatively that even if Faulk were exposed, the ALJ erred by not finding that Norshipco rebutted the presumption of compensability given the latency of the disease and the brevity of the exposure. With regard to latency, Norshipco points to evidence that Faulk began experiencing abdominal pain prior to the U.S.S. Flint incident. Because Faulk experienced abdominal pain prior to the Flint incident and the latency period for the disease is so long, Norshipco argues that it is factually impossible for employment at Norshipco to have contributed to Faulk's mesothelioma. We disagree.

The Ninth Circuit rejected just this type of latency argument by an insurance carrier in Lustig v. U.S. Dep't of Labor, 881 F.2d 593, 596 (9th Cir. 1989). In Lustig, the claimant worked for Todd Pacific Ship-yards where he was exposed to asbestos during his employment as a pipefitter for approximately twenty-two years. Travelers Insurance provided LHWCA coverage to Todd for the first fifteen years of the claimant's employment, and Aetna did so for the remaining time. According to the Ninth Circuit, Aetna's contention, that a ten-year latency period for asbestos-related cancer meant that any exposure after that time period would not have affected the claimant's disability, "suggest[ed] an unwarranted change of the `last employer rule' set forth in [Cardillo]." Id. Here, notwithstanding a prolonged latency period, Norshipco employed Faulk during the last eighteen years of his employment. During this period, Faulk was exposed to asbestos; and, Norshipco has failed to establish that such exposure could not have caused his mesothelioma. As the last employer, Norshipco is liable for the full amount of the claim.

Norshipco's reliance on Port of Portland v. Director, OWCP (Ronne), 932 F.2d 836, 840 (9th Cir. 1991), is misplaced. There the court held that it was factually impossible for the claimant's employment with the employer to have contributed in any way to his hearing loss where the claimant began his employment four days after the administration of the audiogram indicating his hearing loss. While the

13

court recognized "a demonstrated medical causal relationship between the claimant's exposure and his occupational disease" was not required, it insisted on a "rational connection." Id. The evidence in this case fails to support the inference that due to the prolonged latency period of mesothelioma it was factually impossible for Faulk to have sustained injury by his exposure at Norshipco. Furthermore, Faulk was not diagnosed with the disease until after the U.S.S. Flint incident.

Norshipco also suggests that it does not qualify as the responsible employer because Faulk's exposure was too brief or too minimal to have caused the disease. However, even assuming the applicability of a de minimus requirement, Norshipco has presented no evidence to establish that Faulk's exposure aboard the U.S.S. Flint was, in fact, de minimus. It presented no evidence of the asbestos level on the U.S.S. Flint the day of the incident, nor did it present evidence of the level of exposure it would take to cause the disease. Dr. Fairman merely opined that the U.S.S. Flint exposure did not cause Faulk's mesothelioma. He did not state that such exposure did not have the potential to cause the disease or was in insufficient quantities to cause it.

Furthermore, this court has never required proof of a certain level of exposure to injurious stimuli in order to warrant the attachment of liability under the LHWCA. The reason for this stems directly from the humanitarian nature of the LHWCA. See Newport News Ship-building and Dry Dock Co. v. Fishel, 694 F.2d 327, 330 (4th Cir. 1982) (accepting the aggravation rule for compensability under the LHWCA, in part, based upon the humanitarian nature of the Act). "The purpose of the Act is to help longshoremen." Id. (citing Reed v. Steamship Yaka, 373 U.S. 410, 415 (1963)). It is from this purpose that the last employer rule originates, as well as a concern for administrative ease of claims handling and an elimination of the inherent difficulty in attempting to apportion liability among employers. See Cardillo, 225 F.2d at 145. Requiring the employee to prove sufficient levels of exposure to cause the disease puts obstacles before the employee. Whereas, the last employer rule works on the premise that all employers will be the last employer an equal amount of the time. See Todd Shipyards Corp. v. Black, 717 F.2d 1280, 1285 (9th Cir. 1983). In our view, Norshipco's proposed rule would simply not pro-

14

mote the purposes of the LHWCA. We further note that the Fifth Circuit has also refused to set de minimus standards for exposure. Citing Cardillo, it rejected an employer's claim that exposure to sandblasting on two occasions was insufficient to impose liability. See Fulks v. Avondale Shipyards, Inc., 637 F.2d 1008, 1011-12 (5th Cir. 1981); see also Cuevas, 977 F.2d at 190 ("regardless of the brevity of the exposure, if it has the potential to cause disease, it is considered injurious").

Norshipco maintains that we should adopt the rule applied by the Ninth Circuit in Todd Pacific Shipyards Corp. v. Director, OWCP (Picinich), 914 F.2d 1317 (9th Cir. 1990). In that case the court held that the claimant must be exposed "to injurious stimuli in sufficient quantities to cause the disease." Id. at 1319. Norshipco interprets this holding as establishing a requirement that the exposure to injurious stimuli be more than de minimus. However, we decline to adopt such a rule. In Picinich, the ALJ determined that the claimant's exposure was "non-injurious" when the ship on which the claimant worked had undergone a complete asbestos removal procedure prior to his tenure, and testing of the area showed asbestos levels 250 times below the limit allowed by government regulations. Id. at 1320-22. This is clearly distinguishable from the case at bar.

IV.

Upon application of the presumption to both NNS and Norhshipco, we find that neither employer rebutted the presumption of compensability raised against each of them. Consequently, we find Norshipco liable as the last employer.

As the responsible employer in this matter pursuant to the provisions of the LHWCA, Norshipco is entitled to credit for the net amount of all settlement proceeds received by and/or on behalf of the Faulk from the Manville Settlement Trust in the amount of $20,000.00, and from the Center for Claims Resolution for $20,000.00, and from all settlements obtained to date.

Accordingly, the decision of the Benefits Review Board, affirming the ALJ's order for full compensation is

 AFFIRMED.

15