United States Court of Appeals,

Fifth Circuit.

No. 91–4905.

AVONDALE INDUSTRIES, INC., Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United States
Department of Labor and Wilton J. Cuevas, Respondents.

Nov. 16, 1992.

Petition for review of an order of Benefits Review Board.

Before HIGGINBOTHAM and DUHÉ, Circuit Judges, and HARMON, District Judge.[*]

HARMON, DistricJudge:

Petitioner Avondale Industries, Inc. challenges a final order of the Benefits Review Board,
affirming an Administrative Law Judge's finding that Avondale Industries, Inc. is responsible for
Respondent–Claimant Wilton J. Cuevas' compensation for occupational hearing loss under the
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* Specifically the
employer argues that the Administrative Law Judge and the Benefits Review Board misapplied the
rule that the last maritime employer to expose a claimant to injurious stimuli before the claimant
became aware of his impairment is the responsible party. Because we find that there is no error of
law and because the record supports the Board's determination that the Administrative Law Judge's
findings were based on substantial evidence, we AFFIRM.

I. Factual and Procedural History

From 1960–1967, when he was employed as a welder and crane operator for Avondale
Industries, Inc. ("Avondale"), Wilton J. Cuevas ("Cuevas") was continually exposed five to seven
days a week to injurious noise emitted from chipping hammers, chains, and fitters in the workplace.
Subsequently, in 1971 Cuevas worked as a stevedore at Sealand Terminal Corporation ("Sealand")
for three to four weeks, between two to six hours a day, unloading bananas from a conveyor belt,

[*]District Judge of the Southern District of Texas, sitting by designation.

occasionally near a forklift that would remove the bananas from the dock area. On September 23, 1986, an audiogram performed on Cuevas by Dr. Thomas Graves revealed a 20.3 percent binaural sensorineural hearing loss, which Graves concluded was noise-induced. Report, Cuevas' Exh. # 3 in Apr. 7, 1989 hearing before ALJ. On April 2, 1987, Cuevas filed a claim against Avondale for occupational hearing loss pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.* A second audiogram on September 28, 1988, administered by Dr. Gordon Lee Stanfield, reflected a 16.8 percent hearing loss in the left ear, a 61.88 percent impairment of the right ear, of which 16.8 percent was attributed to occupational noise exposure, and a 24.31 percent overall binaural hearing loss. Following a hearing, in a Decision and Order dated September 18, 1989 (Rec., Vol. I, 32–38, repeated 62–68), an Administrative Law Judge ("ALJ") found that the two audiograms demonstrated a work-related hearing loss that met the requirements for compensation under 33 U.S.C. § 908(c)(13). The ALJ then averaged the 20.3 percent binaural impairment found by Dr. Graves and the 16.8 percent found by Dr. Stanfield and concluded that Cuevas had an 18.55 percent binaural hearing loss. The ALJ further found that Avondale failed to prove that Cuevas was exposed to injurious noise during his subsequent employment at Sealand and that Avondale was the employer responsible for compensation to Cuevas.

On appeal, Cuevas challenged the ALJ's calculation of compensable impairment, while Avondale cross-appealed the determination that it was the responsible employer. Rec., Vol. I, 2–5. In a September 23, 1991 Decision and Order, the Benefits Review Board ("Board") found that the ALJ erred in failing to apply the aggravation rule[1] when he determined what percentage of Cuevas' hearing loss was compensable. Moreover, the Board modified the award based on its established rule that an award for occupational, noise-induced hearing loss must be based on a binaural assessment. Thus the Board concluded that the ALJ should have used Dr. Stanfield's figure of 24.31 percent binaural impairment, rather than the 16.8 percent for one year. It recalculated the appropriate award by averaging the correct figures (20.3 percent and 24.31 percent) for a determination of 22.3 percent

---

[1]The aggravation rule allows a claimant compensation for his entire hearing loss where work-related acoustic trauma aggravates or combines with a prior hearing impairment. *See, e.g., Strachan Shipping Co. v. Nash,* 782 F.2d 513, 517 (5th Cir.1986) (en banc).

binaural impairment. This ruling has not been appealed.

Otherwise the Board[2] found that there was substantial evidence in the record to support the ALJ's decision and that it was reasonable. It therefore affirmed the finding that Cuevas was not exposed to injurious stimuli while he worked at Sealand and that Avondale was the maritime employer responsible for compensation.

Contesting the finding of its responsibility for compensation, Avondale filed a timely petition for review by this Court under 33 U.S.C. § 921(c).

## II. Discussion

(A) Standard of review

This Court's review is limited to determining whether the Board's decision correctly concluded that the ALJ's order was "supported by substantial evidence on the record as a whole and is in accordance with the law." *Odom Construction Company v. United States Department of Labor,* 622 F.2d 110, 115 (1980), *cert. denied,* 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981), quoting *Diamond M. Drilling Co. v. Marshall,* 577 F.2d 1003, 1005 (5th Cir.1978) "Substantial evidence is evidence that provides "a substantial basis of fact from which the fact in issue can be reasonably inferred ... more than a scintilla ... more than create a suspicion ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Diamond,* 577 F.2d at 1006, quoting *NLRB v. Columbian Enameling and Stamping Co.,* 306 U.S. 292, 299–300, 59 S.Ct. 501, 504–505, 83 L.Ed. 660 (1939). The substantial evidence standard is less demanding than that of preponderance of the evidence, and the ALJ's decision need not constitute the sole inference that can be drawn from the facts. *Id.* As fact finder, the ALJ determines questions of credibility of witnesses and of conflicting evidence. He is not required to accept the opinion or theory of a medical expert that contradicts the ALJ's findings based on common sense. *Atlantic Marine v. Bruce,* 661

[2]"The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3). The Board must accept the ALJ's findings unless they are contrary to law, irrational, or unsupported by substantial evidence. *Fulks v. Avondale Shipyards, Inc.,* 637 F.2d 1008, 1011 (5th Cir.) (citing *Cardillo v. Liberty Mutual Ins. Co.,* 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947)), *cert. denied,* 454 U.S. 1080, 102 S.Ct. 633, 70 L.Ed.2d 613 (1981).

F.2d 898, 900 (5th Cir.1981).

(B) Relevant Law

*Travelers Insurance Co. v. Cardillo,* 225 F.2d 137, 145 (2d Cir.), *cert. denied,* 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955), established the "last employer rule" for determining under LHWCA which maritime employer is responsible for payment of the full amount of benefits awarded as compensation to claimants for occupational diseases, including noise-induced hearing loss:

> Congress intended that the employer during the last employment in which the claimant was exposed to injurious stimuli, prior to the date upon which the claimant became aware of the fact that he was suffering from an occupational disease arising out of his employment, should be liable for the full amount of the award.

*See also Fulks v. Avondale Shipyards, Inc.,* 637 F.2d 1008, 1012 (5th Cir.) (applying *Cardillo* 's last employer rule), *cert. denied,* 454 U.S. 1080, 102 S.Ct. 633, 70 L.Ed.2d 613 (1981); *Argonaut Insurance Company v. Patterson,* 846 F.2d 715, 719 (11th Cir.1988) (stating that prior to the split of the 5th and 11th Circuits, the Circuit adopted the last employer rule in *Fulks* ). This rule was created to avoid the difficulties and delays in administration which would result if courts attempted to apportion liability among multiple employers. *Cardillo,* 225 F.2d at 145. Moreover "[t]he nature of occupational diseases ... makes it exceedingly difficult, if not practically impossible, to correlate the progression of the disease with specific points in time or specific industrial experiences." *Cardillo,* 225 F.2d at 144.

In *Susoeff v. The San Francisco Stevedoring Co.,* 19 BRBS 149, 1986 WL 66392 at *2 (Ben.Rev.Bd. Nov. 28, 1986), the Board stated, "The last employer rule is not a rule of compensability. Rather, it is a judicially created rule for allocating liability among employers in cases where an occupational disease develops after prolonged exposure." Thus a claimant does not have to prove that his employer is liable. Once he has demonstrated a *prima facie* entitlement to benefits by showing that he "sustained physical harm and that conditions existed at work which could have caused the harm," he has established his "exposure to injurious stimuli during employment covered under the [LHWCA], and there exists a compensable claim. Employer can then rebut this presumption by showing that exposure to injurious stimuli did not cause the harm.... [or] that employee was exposed to injurious stimuli while performing work covered under the [LHWCA] for

a subsequent employer" (citations omitted). *Id.* *See also General Ship Service v. Director, Office of Workers' Compensation Programs,* 938 F.2d 960, 961 (9th Cir.1991) (applying *Susoeff* ).

The Fifth Circuit has further held that, regardless of the brevity of the exposure, if it has the potential to cause disease, it is considered injurious. *Fulks,* 637 F.2d at 1012 (refusing to set *de minimis* standards for duration of exposure).

Avondale's counsel contended at oral argument that its burden of proof to show a potentially injurious environment under a subsequent, maritime employer is "featherweight," like the claimant's in establishing a *prima facie* case. He provided no legal authority for his stance. This Court finds no policy underlying the last causative employer rule to justify lightening Avondale's burden to rebut the presumption that it is liable. If anything, the rule is designed to insure that an injured worker is compensated without delays and without administrative difficulties, not to protect employers. Indeed, although the shifting burden of proof provides the employer with an opportunity to safeguard its interests, the rule can operate inequitably where the claimant worked only a minimal time for the last covered employer.

(C) Application

The issue before this Court is whether the Board correctly determined that the ALJ did not err in finding that Avondale failed to meet its burden of proof.

The parties stipulated that Cuevas suffered a hearing loss because of workplace noise and that Cuevas became aware of his injury during the first audiogram on September 23, 1986, substantially after his employment by both Avondale and Sealand. Avondale, against which Cuevas filed his claim, does not contest Cuevas' exposure to injurious noise at its workplace. At issue before the ALJ was whether Cuevas was exposed to injurious noise at Sealand, his last covered employer covered by the LHWCA. If not, Avondale is responsible for his compensation.

The ALJ ruled that Avondale did not satisfy its burden of proof to rebut the presumption that it was the responsible employer because it did not show subsequent injurious exposure at Sealand. The ALJ found that the only evidence offered by Avondale, the post-hearing deposition of Dr. Stanfield, was too speculative and thus of little weight. Since by stipulation Cuevas established a

*prima facie* case, the burden shifted to Avondale to show that Sealand, as a subsequent employer covered by LHWCA, exposed Cuevas to injurious noise and is therefore liable for his compensation.

At the hearing on April 7, 1989, Cuevas testified that the noise at Avondale's shipyard was so loud that "you couldn't hardly hear yourself talk." Rec., Vol. II, 8. In contrast, he described the noise environment at Sealand as "just like around town, standing on a corner...." *Id.* at 10. His job was to take bananas off a little conveyor belt, made mostly of rubber, and to load them onto another man's back. *Id.* at 12–13, 15, 16. He did not operate a forklift, crane, or other equipment at Sealand. *Id.* at 12, 16. Occasionally forklifts and machinery came by, and the men would take their load of bananas about twenty-five yards and set them down. *Id.* at 14. No material was offloaded from the boats by crane. *Id.*

After Cuevas filed his claim, Avondale sent him to Dr. Stanfield for another audiogram. Rec. Vol. II, 17. Subsequently Cuevas' claim was presented to the ALJ. As its only evidence to rebut the presumption of its liability, Avondale submitted, with approval of the ALJ, a transcript of Stanfield's post-hearing deposition. During that deposition, Avondale's attorney asked Stanfield to respond to a hypothetical question conditioned on some suggestively worded and unsubstantiated assertions about Sealand's workplace:

> Doctor, if I was to tell you that Mr. Cuevas has testified at the trial[3] of his case in 1971, which would have been after he worked for Avondale, that he worked for Sea–Land Terminal Corporation in Gulfport, and worked there for a minimal period of time for the quarter April to June, and then worked another week or so for the quarter July to September of that year, again 1971, that in that employment he worked as a stevedore unloading bananas off of ships that came into the Gulfport facility, that in that job he worked more or less on a conveyor belt where the conveyor would go into the hold of the ship, bananas would then be placed on the conveyor belt, then come out of the hold of the ship onto the dock, where Mr. Cuevas would take bananas as they came from the conveyor belt, take them off of the conveyor belt, and either put them on someone's shoulder, another stevedore, or would put them on a pallet for the forklift, that he worked on the dock, that there were forklifts that were involved in his employment, that he came in contact with these forklifts on a regular basis, and was involved with this conveyor system that went into the hold of the ship in order to transport the bananas, knowing that he worked around forklifts, ships, conveyor belts, and the normal noises that one would associate with dock activity, do you feel that he was exposed during that employment to high levels of noise or dangerous levels of noise, that is sufficient enough to cause hearing loss?

_____

[3]At the close of the April 7, 1989 hearing, the ALJ allowed Avondale to keep the record open to take Dr. Stanfield's deposition, which occurred on May 23, 1989.

Complete transcript of Dr. Stanfield's May 23, 1989 deposition ("Dep."), pp. 21–23.

Dr. Stanfield did not hear or review Cuevas' actual testimony at the April 7, 1989 hearing; the hypothetical question, which exaggerated Cuevas' stated contact with forklifts and implies the dock area and conveyor system were noisy, was Stanfield's sole guide to alleged conditions of Cuevas' employment at Sealand. A visit to the premises, eighteen years after the time in issue, was not likely to be probative.

Stanfield answered the question with a further inaccuracy about the legally irrelevant duration of the Sealand job and with emphasis on the limited picture provided to the audiologist:

> Within the confines of what you have given me there of approximately six months, from what I gather, probably, on and off, and the equipment of forklifts or tow motors, conveyor systems, I would without any other information feel like there was probably potentially hazardous noise in the environment.
>
> I have not measured the specifics that you said or the particular environment. I have take measures on forklifts in other environments, and I would probably be basing it primarily on that information, and I have measured them at greater than eighty-five, eighty-five to possibly eighty-eight db levels, and I feel like at that point you are becoming into [*sic*] a hazardous noise area.

Dep. at 23–24. He further stated that "the forklift itself measures generally over eighty-five. The backup warning devices, which are generally required on them go even higher...." *Id.* at 26.

On cross-examination, Stanfield admitted that he had never seen any dosimeter studies that might have been performed on Sealand's equipment or work areas. *Id.* at 25. Moreover in response to the critical question, "Wouldn't it be important to know how close the patient was to the forklifts?," Stanfield answered, "Well, the most desirable one would have been to have full sound recordings and dosimeters, yes. Certainly." *Id.* at 27. Although Avondale had the burden of proof, its counsel never asked Cuevas how near to the forklifts he had worked. Finally, when Stanfield was asked if he had any reason to disbelieve Cuevas' testimony that the noise at Sealand was not unusually loud, Stanfield replied, "No. A forklift is not a terribly loud device." *Id.* at 28.

We find reasonable and substantially supported by the record the ALJ's decision to believe Cuevas' testimony of personal experience over Stanfield's theoretical response to a hypothetical question of dubious accuracy and completeness.

The Director of the Office of Workers' Compensation Programs has asked the Court to issue

a procedural rule mandating the joinder of any alleged, subsequent causative employer before the ALJ.  Because the Court upholds the decision of the Board here, that request is not relevant to this case.  Moreover we consider this issue to be more appropriately addressed to the agency or the ALJ.

Accordingly, we AFFIRM the Board's decision.