# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-60004

United States Court of Appeals
Fifth Circuit

**FILED**
September 11, 2019

Lyle W. Cayce
Clerk

TOM L. MAYS,

> Petitioner - Cross-Respondent

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR

> Respondent - Cross-Respondent

v.

HUNTINGTON INGALLS, INCORPORATED,

> Respondent - Cross-Petitioner

Petitions for Review of an Order
of the Benefits Review Board

Before HIGGINBOTHAM, ELROD, and HO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Tom Mays and his former employer, Huntington Ingalls, Inc. ("Avondale"), cross-petition for review of an order of the Benefits Review Board denying Mays's motion for modification of his Longshore and Harbor Workers' Compensation Act benefits. We affirm.

No. 18-60004

## I.

This case arises from nearly three decades of administrative and state-court litigation. In the spring of 1991, Tom Mays was employed by Avondale as a welder at its shipyard in Avondale, Louisiana. Avondale contracted with International Marine & Industrial Applicators, Inc. ("IMIA" or "International Marine") for cleaning and sandblasting services on a Naval vessel. Under the companies' agreement, IMIA employees would work at Avondale's facility for up to ninety days, during which time they would continue to be supervised and insured by IMIA. Although Avondale reserved the right to remove IMIA employees from its shipyard, only IMIA could fire them. At the end of the sandblasting job, Avondale was to pay IMIA a fixed lump sum, out of which IMIA would compensate its own workers.

John Gliott was one of the IMIA employees placed on temporary work duty at the Avondale shipyard. On March 18, 1991, Gliott kicked Mays in the head, fracturing Mays's cheekbone and injuring his eye. Mays was treated for his injuries, underwent surgery, and saw several psychiatrists to address a resulting psychological condition. Avondale voluntarily paid Mays $5,514.68 in disability and medical benefits for a five-month period, after which it requested that he return to work. Mays did not return, and instead filed a claim for workers' compensation benefits under the Longshore and Harbor Workers' Compensation Act ("the Act").[1] The Office of Administrative Law Judges ("ALJ") initially denied Mays's claims for medical benefits and wage indemnity, but reversed its position as to medical benefits upon remand from the Benefits Review Board ("BRB" or "Board"). Avondale appealed, and the Board affirmed.

---

[1] 33 U.S.C. § 901 *et seq.*

No. 18-60004

Meanwhile, Mays had filed suit against Gliott and IMIA in Louisiana state court. In January of 2000, Mays accepted a settlement of $60,000 from Gliott and IMIA without Avondale's approval. As part of the settlement agreement, Mays agreed to "dismiss all claims in the Longshoremen and Harbor Workers Compensation matter against Avondale." Following the settlement, Avondale sought relief against Mays under Section 33(g) of the Act, which requires an injured employee to obtain his employer's approval before accepting a third-party tort settlement for less than the value of his workers' compensation benefits.[2] If the employee fails to obtain employer approval of such a settlement, "all rights to compensation and medical benefits . . . shall be terminated."[3]

Avondale argued that because it had not approved Mays's settlement with Gliott and IMIA, it was no longer liable for his medical expenses pursuant to Section 33(g). At the same time, Mays filed a request for modification of his workers' compensation award, providing new documentation showing that his injuries were more extensive than previously recognized.[4] The ALJ denied Avondale's request because the $60,000 settlement exceeded the value of the workers' compensation benefits Mays had received up to that point, rendering Section 33(g) inapplicable. However, the ALJ granted Avondale relief under Section 33(f) of the Act, which entitles an employer to credit its liability for medical benefits against the net settlement amount.[5] Finally, the ALJ denied Mays's request for modification as untimely.

---

[2] 33 U.S.C. § 933(g).

[3] *Id.* § 933(g)(2).

[4] Section 22 of the Act "provides two avenues for modification of a prior judgment: (1) a change in conditions, or (2) a mistake in a determination of fact by the ALJ." *Island Operating Co., Inc. v. Dir., OWCP*, 738 F.3d 663, 667 (5th Cir. 2013); *see* 33 U.S.C. § 922.

[5] *See* 33 U.S.C. § 933(f).

3

No. 18-60004

On appeal, the Board affirmed the ALJ's grant of Section 33(f) relief but found that Mays's modification action was not time-barred. The Board remanded the case with instructions to determine whether Mays was entitled to any further periods of disability compensation and, if so, whether his lifetime compensation benefits would become subject to forfeiture under Section 33(g).

Mays withdrew his request for modification in 2006 but reinstated it several years later, this time arguing that a mistake of fact had been made in the earlier proceedings. Mays claimed that he had never entered into a third-party settlement because Gliott was a borrowed servant of Avondale, not a third-party employee of IMIA. Because Longshore Act compensation is the exclusive remedy for an employee injured by a person "in the same employ," neither Section 33(f)'s setoff provision nor Section 933(g)'s forfeiture provision would apply if Gliott were determined to be Avondale's borrowed servant.[6]

In July of 2016, the ALJ rejected Mays's mistake-of-fact argument and found that Gliott was not a borrowed servant. However, the ALJ also found that Mays was entitled to additional disability compensation of $335,012.08.[7] Had the inquiry ended there, Mays's compensation would have been modified upward by this amount. However, per the Board's earlier instruction, the ALJ next considered the interaction between the hypothetical increase in compensation and Mays's settlement with Gliott and IMIA. Before the hypothetical increase, Mays's workers' compensation was less than his recovery under the settlement. However, with the increase, Mays's compensation would far exceed his recovery under the settlement, and this change would trigger Section 33(g) of the Act. Because Avondale had not

---

[6] *Id.* § 933(i); *see Gaudet v. Exxon Corp.*, 562 F.2d 351, 354 & n.4 (5th Cir. 1977).

[7] Because of a technical error, the ALJ initially found that Mays was entitled to an additional $502,518.13. It corrected that figure downward on reconsideration.

approved the settlement and Gliott was not an Avondale employee, Mays would forfeit his benefits under the Act. In short, if the ALJ were to make the hypothetical increase in benefits, it would also have to cancel those benefits under Section 33(g)—resulting in no change for Mays. Thus, the ALJ denied the modification.

In affirming this decision, the Benefits Review Board stated that because the request for modification was denied, the status quo ante remained in place: "The result of the denial of [Mays's] motion for modification is that the administrative law judge's prior award of medical benefits to claimant and offset to employer of the net amount of the third-party settlement pursuant to Section 33(f) remain in effect." The Board denied both parties' motions for reconsideration. Mays and Avondale now cross-petition for review of the Board's affirmance. Mays objects to the Board's findings on Gliott's employment status, while Avondale challenges the Board's denial of Section 33(g) relief.

## II.

## A.

Our review of BRB decisions is limited. We inquire only whether the Board "correctly concluded that the ALJ's order was 'supported by substantial evidence on the record as a whole and is in accordance with the law.'"[8] Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion."[9] "The substantial evidence standard is less demanding than that of preponderance of the evidence, and the ALJ's decision need not constitute

---

[8] *Avondale Indus., Inc. v. Dir., OWCP*, 977 F.2d 186, 189 (5th Cir. 1992) (quoting *Odom Constr. Co. v. United States Dep't of Labor*, 622 F.2d 110, 115 (5th Cir. 1980)); *see Ceres Gulf, Inc. v. Dir., OWCP*, 683 F.3d 225, 228 (5th Cir. 2012).

[9] *Avondale*, 977 F.2d at 189 (quoting *Diamond M Drilling Co. v. Marshall*, 577 F.2d1003, 1006 (5th Cir. 1978)).

## No. 18-60004

the sole inference that can be drawn from the facts."[10] To the contrary, the ALJ "is exclusively entitled to assess both the weight of the evidence and the credibility of witnesses," and neither the Court nor the Board may substitute its judgment for that of the ALJ.[11]

### B.

We consider the nine *Ruiz* factors to determine whether an employee is a borrowed servant:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?[12]

Although no single one of these factors is decisive, the first is the most critical.[13] As we have stated, "[t]he central question in borrowed servant cases

---

[10] *Id.*

[11] *Bis Salamis, Inc. v. Dir., OWCP*, 819 F.3d 116, 126 (5th Cir. 2016) (quoting *Ceres Gulf*, 683 F.3d at 228); *see Ingalls Shipbuilding, Inc. v. Dir., OWCP*, 991 F.2d 163, 165 (5th Cir. 1993).

[12] *Gaudet*, 562 F.2d at 355 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969)).

[13] *See Hall v. Diamond M Co.*, 732 F.2d 1246, 1249 (5th Cir. 1984) (per curiam).

No. 18-60004

is whether someone has the power to control and direct another person in the performance of his work."[14]

## C.

In general, the Longshore and Harbor Workers' Compensation Act "allows injured workers, without forgoing compensation under the Act, to pursue claims against third parties for their injuries."[15] However, Sections 33(f) and 33(g) of the Act place limits on this right. Section 33(f) provides in relevant part:

> If the person entitled to compensation institutes proceedings [against a third-party tortfeasor] the employer shall be required to pay as compensation under this chapter a sum equal to the excess of the amount which the Secretary determines is payable on account of such injury or death over the net amount recovered against such third person.

In other words, when an injured worker successfully sues a third party, the worker's employer is entitled to reduce the benefits it would otherwise owe under the Act by the amount the worker recovers from the third party.[16]

In addition, Section 33(g) imposes duties on the worker-plaintiff himself. Under Section 33(g)(1), an injured worker must obtain his employer's written approval before accepting a settlement from a third-party tortfeasor for any "amount less than the compensation to which the [employee] would be entitled under" the Act.[17] If the employee fails to obtain that prior approval, "all future

---

[14] *Hebron v. Union Oil Co. of Cal.*, 634 F.2d 245, 247 (5th Cir. Unit A Jan. 1981) (per curiam) (citing *Gaudet*, 562 F.2d at 355).

[15] *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 471 (1992).

[16] *See Jackson v. Land & Offshore Servs., Inc.*, 855 F.2d 244, 246 (5th Cir. 1988) (per curiam) (noting that the employer's "right to set-off the amount of the settlement against future payments" furthers the statutory goal of "protect[ing] the compensation scheme from costs that should be borne by third party tortfeasors").

[17] 33 U.S.C. § 933(g)(1).

benefits including medical benefits are forfeited."[18] Where an employee obtains a court judgment against a third party or accepts a settlement for *more* than the compensation due under the Act, his duty to his employer is less onerous. In such cases, Section 33(g)(2) requires only that the employer receive notice, not register its approval.[19] Together, these provisions of Section 33(g) are "designed to ensure that the employer's rights are protected . . . and to prevent the claimant from unilaterally bargaining away funds to which the employer or its carrier might be entitled under" the Act.[20]

## III.

Mays contends that the Benefits Review Board erred by concluding that Gliott was an independent contractor employed by IMIA rather than a borrowed servant of Avondale. Specifically, Mays challenges the Board's analysis of the *Ruiz* factors and its conclusions as to Avondale's purported judicial admissions regarding Gliott's employment status and the relevance of certain Board precedent.

## A.

The ALJ found that eight of the nine *Ruiz* factors weighed against borrowed servant status, and one factor was neutral. The Board affirmed, concluding that while the evidence may not have been as overwhelming as the ALJ suggested, "at least five of the nine factors favor the finding that . . . Gliott is a 'third party' and not [Avondale's] borrowed employee." We find no genuine issue as to any of the facts concerning the *Ruiz* factors.[21] Therefore, the only

---

[18] *Cowart*, 505 U.S. at 471.

[19] *See* 33 U.S.C. § 933(g)(2).

[20] *Parfait v. Dir., OWCP*, 903 F.3d 505, 509 (5th Cir. 2018).

[21] *See Kiff v. Travelers Ins. Co.*, 402 F.2d 129, 131 (5th Cir. 1968) (noting that where the relevant facts are undisputed, the borrowed servant determination is a question of law to be decided by the court).

question for this Court is whether the BRB erred as a matter of law in finding that Gliott was an independent contractor.[22]

Regarding the first and most important *Ruiz* factor, the ALJ and BRB agreed that IMIA retained control over Gliott and his work at the Avondale shipyard. The primary evidence for this conclusion was the testimony of IMIA's president that his on-site foremen were in charge of all tasks to be performed by IMIA employees. Mays now argues that the control factor favors borrowed servant status for four reasons. First, "[c]ontrary to the [ALJ's] conclusion, the control factor does not require micromanagement." Second, Avondale inspected the work of the IMIA employees to ensure it was up to Avondale's standards— a power Mays describes as "the essence of control." Third, Avondale, not IMIA, conducted the investigation of the Mays-Gliott altercation. Finally, ultimate direction over IMIA's tasks came from Avondale: "IMIA did not simply appear one day at the Avondale site and begin working where it wanted, doing whatever it wanted." Therefore, "[a]ny orders Gliott received from his supervisors were in direct response to IMIA's orders from Avondale." Avondale counters that "[t]here is absolutely no evidence in the record that anyone from Avondale had control over Mr. Gliott's work in any manner." Furthermore, Mays himself testified that he and Gliott had two separate foremen, indicating that IMIA never relinquished control over Gliott's employment.[23]

We agree with the administrative courts below that the first factor weighs in favor of independent contractor status. As we have long noted, "a careful distinction must be made 'between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the

---

[22] *See Gaudet*, 562 F.2d at 358–59.

[23] *See Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 616, 618 (5th Cir. 1986) (considering "direct supervision" by an agent of the purported borrowing employer as a factor supporting borrowed servant status).

work furnished is part of a larger undertaking.'"[24] "'Co-operation,' as distinguished from 'subordination,' is not enough to create an employment relationship."[25] Here, the facts indicate that although Avondale monitored the sandblasting project it had hired IMIA to complete, Avondale did not direct the actions of IMIA employees during the course of their daily work. Some degree of oversight is a necessary component of any contract relationship; it is never the case that an independent contractor "simply appear[s]" at a job site and does "whatever it want[s]." Avondale's quality checks and general site management are readily distinguished from the conduct of a borrowing employer, who gives direct orders to its borrowed servant.[26]

Next, we disagree with the ALJ and BRB's conclusion that the second *Ruiz* factor—whose work is being performed—is neutral. Instead, we conclude that the second factor weighs in favor of borrowed servant status. It is true that unlike the labor pool companies that feature in many borrowed servant cases, IMIA did have a substantial business function independent of its work with Avondale.[27] However, the discrete tasks IMIA completed at the Avondale shipyard were crucial to Avondale's ship-expansion contract with the United States Navy. In analogous cases, the Court has consistently held that a worker assisting with a company's central task is functionally an employee of the company, even if his payroll employer is a separate entity. In *Melancon*, for example, we held that a welder whose work assisted the borrowing employer with "an essential, although only incidental, aspect of [its] business" was

---

[24] *Ruiz*, 413 F.2d at 313 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222 (1909)).

[25] *Id.* (quoting *Anderson*, 212 U.S. at 226).

[26] *See, e.g.*, *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988); *Hebron*, 634 F.2d at 247.

[27] *See, e.g.*, *Capps*, 784 F.2d at 616 (according borrowed servant status to a worker whose nominal employer was "a company specializing in the supplying of general laborers to companies in need of temporary help").

properly categorized as a borrowed servant.[28] Moreover, at least one court adjudicating a separate dispute involving the same corporate parties has concluded that the tasks IMIA employees performed at the Avondale shipyard were ultimately part of Avondale's work.[29]

Next, although the ALJ considered the third *Ruiz* factor neutral, the Board found that "there was no agreement between the two employers that Gliott would become [Avondale's] servant." We agree with the ALJ and hold that the third *Ruiz* factor is neutral. Given that discovery took place more than two decades after the underlying altercation, it is unsurprising that Avondale was unable to produce the Master Service Agreement between itself and IMIA. Lacking the Agreement or the testimony of the executives who arranged it, the Court cannot credit the inferences urged by either side.[30]

The fourth *Ruiz* factor considers whether the employee acquiesced in his new work situation.[31] The ALJ and the Board concluded that Gliott did not acquiesce to becoming Avondale's borrowed servant because the Avondale job lasted only a few months, during which IMIA maintained control over Gliott's tools, equipment, and wages. As Mays points out, however, the administrative courts applied an incorrect legal standard. The question is not whether Mays agreed to become Avondale's employee but whether he "was aware of his work

---

[28] *Melancon*, 834 F.2d at 1245; *see also Lemaire v. Danos & Curole Marine Contractors, Inc.*, 265 F.3d 1059, at *2, *5 (5th Cir. 2001) (unpublished) (per curiam) (describing a situation in which workers' nominal employers "were under contract with Texaco to provide employees to operate Texaco platforms offshore" as exemplifying "the nature of the 'borrowed employee'" relationship).

[29] *Musa v. Litton-Avondale Indus., Inc.*, 10-627 (La. App. 5 Cir. 3/29/11), 63 So. 3d 243, 247.

[30] Given the age of the document and the many corporate transitions that have happened in the years since it was executed, the Court declines Mays's request to draw an adverse inference against Avondale for failing to produce the Agreement.

[31] *Gaudet*, 562 F.2d at 355 (citing *Ruiz*, 413 F.2d at 312–13).

conditions and chose to continue working in them."[32] It is clear from the facts presented that Gliott was aware of his working conditions at the Avondale site and voluntarily continued to work there.[33] The fourth *Ruiz* factor therefore supports borrowed servant status.

However, the fifth factor—whether the original employer terminated his relationship with the employee—clearly supports independent contractor status. The ALJ and the Board agreed "that [IMIA] continued to employ [Gliott], provided for his Longshore insurance, paid his wages, provided him with his tools and equipment for work, and supervised him on a daily basis." Moreover, Gliott moved with IMIA to its next job when the contract at Avondale was finished. Of course, the fifth *Ruiz* factor does not "require[] a lending employer to completely sever his relationship with the employee" before the employee may be considered a borrowed servant.[34] However, it does require that the lending employer "cease[] *control* in its relationship" with the employee.[35] Here, IMIA retained control over all the most important aspects of Gliott's employment: his pay, his performance, his supplies, and his insurance.

The sixth factor—who furnished the tools and place of performance—likewise indicates that Gliott was an independent contractor, not an Avondale employee. The ALJ found that "International Marine provided the scaffolding and [Gliott's] tools of work, while [Avondale] provided the ship and shipyard on which he worked." Contrary to the Board's conclusion, however, this bifurcation of duties between IMIA and Avondale does not render the sixth

---

[32] *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 678 (5th Cir. 1993) (per curiam) (citing *Melancon*, 834 F.2d at 1246).

[33] *See Fontenot v. Mobil Oil Expl. & Producing Se., Inc.*, 997 F.2d 881, at *3 (5th Cir. 1993) (per curiam) (citing *Capps*, 784 F.2d at 617) ("[T]his court considers [a worker's] acceptance of a job that regularly sent him to temporary work places as acquiescence to each of those employment situations.").

[34] *Capps*, 784 F.2d at 617.

[35] *Melancon*, 834 F.2d at 1246 (emphasis added).

factor neutral. In this case, the tools provided by IMIA were essential to Gliott's task, while the location of the work was merely incidental. The facts are readily distinguished from *Melancon*, which Mays cites for the proposition that the company at whose site the work takes place should generally be considered the true employer. In *Melancon*, the worker was required to be on the borrower's premises because operation of the premises—an oil drilling platform—was the very job to be performed.[36] In this case, by contrast, "[i]f the ship had been on International Marine's premises, [Gliott's] work and tools would be the same."

As to the seventh factor, the ALJ found that Gliott's employment was not "over a considerable length of time"[37] because "the job in question lasted no more than 90 days after which Gliott moved with International Marine to its next job." The Board considered this factor neutral, noting that while "a lengthy period of employment tends to support a finding that the worker is a borrowed employee . . . a laborer employed for only one day may be a borrowed servant" under the right set of facts.[38] Although scattershot findings abound, the case law provides little guidance on how to categorize Gliott's ninety-day term at Avondale. In *Brown*, for instance, a thirty-day period of employment was considered neutral,[39] while in *Melancon* a seven-year term weighed in favor of borrowed servant status.[40] In another case, we noted that "it is debatable whether approximately a year and a half is a 'considerable' length of time."[41] Given these precedents, we hold there is substantial evidence to support the ALJ's conclusion that Gliott's 90-day term should lead to a neutral finding on the seventh *Ruiz* factor.

---

[36] *See Melancon*, 834 F.2d at 1241.

[37] *Gaudet*, 562 F.2d at 355.

[38] *See Capps*, 784 F.2d at 618.

[39] 984 F.2d at 679.

[40] 834 F.2d at 1246.

[41] *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 390 (5th Cir. 2004).

No. 18-60004

The eighth factor asks which company—the nominal employer or the purported borrowing employer—had the right to discharge the employee. Testimony before the ALJ established that while Avondale could not terminate Gliott's employment, it did have the right to remove him from its property for inappropriate conduct. The ALJ concluded that this factor favored independent contractor status, but the Board found the opposite. We agree with the Board. As Mays argues, "the proper focus when considering who has the right to discharge the employee" is whether the purported borrower "had the right to terminate [the worker's] services with *itself*," not his employment with the lending employer.[42] Avondale does not contest that it could remove Gliott from working on its premises. Therefore, Avondale had the right to "discharge" Gliott within the meaning of the eighth *Ruiz* factor.[43]

Finally, we agree with the ALJ and the Board that the ninth factor—who had the obligation to pay the employee—weighs in favor of independent contractor status. The ALJ found that Avondale "paid [IMIA] a lump sum" upon completion of the contract, and IMIA paid its own employees out of that sum. Avondale never made direct payments to Gliott and had no obligation to do so. Citing *Capps* and *Melancon*, Mays contends that "[w]here the lending employer receives the funds to pay the employee from the borrowing employer, the borrowing employer, in essence, has paid the employee."[44] This is not an entirely accurate representation of our case law. Although a payment to a nominal employer may sometimes constitute an indirect payment to the borrowed servant, that is not always the case. Mays's interpretation would swallow any analysis of this factor; after all, a contractor can always trace his payment in wages back to another employer. Typically, the distinguishing

---

[42] *Capps*, 784 F.2d at 618 (emphasis added); *see Hebron*, 634 F.2d at 247–48.

[43] *See, e.g.*, *Melancon*, 834 F.2d at 1246.

[44] *See Capps*, 784 F.2d at 618; *Melancon*, 834 F.2d at 1246.

factor is the basis on which the purported borrower makes its payments. In both *Capps* and *Melancon*, the borrower paid the nominal employer based on the number of hours the borrowed servant worked, and then the nominal employer paid the borrowed servant a percentage of that payment.[45] Here, by contrast, "[t]he amount International Marine received . . . was not connected to the hours worked" by Gliott or any other IMIA employee.

In sum, four of the nine *Ruiz* factors, including the most important factor of control, indicate that Gliott was not Avondale's borrowed servant. Three factors weigh in favor of borrowed servant status, while the remaining two are neutral. Given this calculus, we affirm the Board's conclusion "that the ALJ's order was supported by substantial evidence on the record as a whole and is in accordance with the law."[46]

## B.

Mays raises two further challenges to the Board's borrowed servant analysis. First, citing *Nicholson v. Securitas Security Services USA, Inc.*, he argues that Avondale is estopped by prior admissions from denying that Gliott was its borrowed servant.[47] In support, Mays points to various statements made by Avondale agents in which Gliott was described as an "employee" of Avondale. For example, in a witness report submitted shortly after Mays's injury, an Avondale employee described the incident as an "altercation between two employees." Later, Avondale appeared to admit in a discovery response that Mays and Gliott were "co-employees," though later in the same document Avondale expressly denied that Gliott was a borrowed employee. For its part, Avondale characterizes these statements as "inadvertent use[s]" of the

---

[45] *See Capps*, 784 F.2d at 618; *Melancon*, 834 F.2d at 1246.

[46] *Avondale*, 977 F.2d at 189.

[47] *See Nicholson*, 830 F.3d 186, 189 (5th Cir. 2016) ("[T]he 'right to control test' is not implicated when there is an admission by a defendant of employment." (internal quotation marks omitted)).

term "employee" and directs the Court to numerous discovery documents in which Avondale denied that Gliott was its employee or borrowed servant.

Avondale is correct that none of the statements to which Mays points constitutes a judicial admission. "A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them."[48] A statement made during the course of a lawsuit—even a statement made in a pleading filed with the court—should be considered a judicial admission only "if it was made intentionally as a waiver, releasing the opponent from proof of fact."[49] An *evidentiary* admission, by contrast, "is 'merely a statement of assertion or concession made for some independent purpose,' and it may be controverted or explained by the party who made it."[50]

Avondale's admissions were of the latter variety. The evidence shows that although Avondale agents occasionally referred to Gliott as an employee, such statements were never made in a context indicating intentional waiver. To the contrary, when specifically asked during discovery, Avondale denied that Gliott was a borrowed employee. *Nicholson* does not dictate a different result. There, the employer had averred that Nicholson was its employee in an employment contract and in its answer, and conceded the point in its briefing to the Court.[51] Unlike here, there were no inconsistent discovery materials or denials of Nicholson's employment status.[52] Considering the full context of the litigation,  the ALJ properly concluded that the statements made by Avondale

---

[48] *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001).

[49] *Id.*; *see Dartez v. Owens-Ill., Inc.*, 910 F.2d 1291, 1294 (5th Cir. 1990).

[50] *Martinez*, 244 F.3d at 476–477 (quoting *McNamara v. Miller*, 269 F.2d 511, 515 (D.C. Cir. 1959)).

[51] *Nicholson*, 830 F.3d at 189.

[52] *See Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001) ("To qualify as a judicial admission, [a] statement must be," among other things, "deliberate, clear, and unequivocal . . . ."); *Dartez*, 910 F.2d at 1294 ("Procedural context may . . . prevent the use as admissions of statements made by a party . . . .").

agents regarding Gliott's employment were not judicial admissions of borrowed servant status.

## C.

Next, Mays argues that the Board erred by failing to follow its own precedent on borrowed servant liability. In Mays's view, the Board's 2010 opinion in *Phillips v. PMB Safety & Regulatory, Inc.* "controls in this case."[53] In *Phillips*, the claimant was injured in an attack by a coworker aboard a Chevron oil rig. Although the attacker and the claimant were nominally employed by separate subcontractors, the BRB concluded that Chevron was liable for the claimant's injuries under the Longshore Act because both workers were Chevron's borrowed servants.[54] Mays claims that *Phillips*'s liability finding controls here because he and Gliott, like the workers in *Phillips*, labored in a confined environment and were both doing work for the same company. Avondale counters that *Phillips* provides no guidance because it does not examine the *Ruiz* factors. Rather, the primary issue in *Phillips* was whether the claimant was acting within the scope of his employment at the time of his injury.

Avondale is correct. Although factual similarities exist between *Phillips* and the present case, *Phillips*'s legal conclusion is not controlling. At no point in *Phillips* does the BRB mention *Ruiz*. In fact, both *Phillips* itself and the Fifth Circuit case upon which it relies assume the prior establishment of borrowed servant status.[55] Only after the *Ruiz* analysis has been conducted and resolved in favor of borrowed servant status does *Phillips* become relevant.

---

[53] *See Phillips*, 44 BRBS 1 (2010 BRB).

[54] *Id.* at 5.

[55] *Phillips*, 44 BRBS at 5; *see Perron v. Bell Maint. & Fabricators, Inc.*, 970 F.2d 1409, 1410 (5th Cir. 1992).

No. 18-60004

Because the *Ruiz* analysis in this case weighs in favor of independent contractor status, *Philips* does not apply.

## IV.

On cross-appeal, Avondale argues that the Board erred in its conclusion as to the form of Section 33 relief to which Avondale is entitled. Section 33(f) entitles an employer to credit "against his compensation payments . . . any amount received by [an] employee by way of settlement with a third party tortfeasor."[56] Section 33(g) contemplates even more significant relief for the employer. Where an employee fails to obtain his employer's approval before accepting a third-party tort settlement for less than the value of his longshore benefits, the employer is completely excused from all statutory obligations to the employee.[57]

In 2003, the Board affirmed the ALJ's grant of Section 33(f) relief to Avondale based on Mays's $60,000 settlement with Gliott and IMIA. In 2016, the ALJ found that Mays was entitled to additional disability compensation of more than three hundred thousand dollars. However, because that additional award would far exceed Mays's earlier, unapproved settlement with Gliott and IMIA, Section 33(g) would mandate forfeiture of the additional award. In other words, it would be a wash. Accordingly, the ALJ denied Mays's request for modification. In affirming the ALJ's decision, the Board noted that "the administrative law judge's prior . . . offset to employer of the net amount of the third-party settlement pursuant to Section 33(f) remain[s] in effect."

Avondale now argues that the Board "should have affirmed the lower Court's ruling based on Section 33(g), which was the basis of the lower Court's decision." To be clear, Avondale does not argue that the Board made an error

---

[56] *Petroleum Helicopters, Inc. v. Collier*, 784 F.2d 644, 646 (5th Cir. 1986) (citing 33 U.S.C. § 933(f)).

[57] 33 U.S.C. § 933(g)(2); *see Cowart*, 505 U.S. at 471.

of law; it argues that the Board "fail[ed] to consider the findings . . . of the Administrative Law Judge whereby [Section] 33(g) was invoked." But Avondale misunderstands the ALJ's decision: it did not modify Mays's benefits and then apply a Section 33(g) forfeiture to the modified amount. Rather, the ALJ determined that modification was not required, because any upwards modification would trigger, and be cancelled out by, a Section 33(g) forfeiture. Thus, the Section 33(f) relief awarded by the ALJ remains in effect, and the unmodified compensation award stands following this appeal.

## V.

We find no error in the Board's conclusion that the ALJ's decision below was supported by substantial evidence and in accordance with the law. The Order of the Benefits Review Board is therefore affirmed.