# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 9, 2023

Lyle W. Cayce
Clerk

No. 22-30420

JERODE GARNER,

*Plaintiff*,

*versus*

PONTCHARTRAIN PARTNERS, L.L.C.,

*Defendant—Appellant*,

*versus*

Z.E. SERVICES, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-1179

Before GRAVES, HO, and DUNCAN, *Circuit Judges*.

PER CURIAM:*

---

* This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-30420

Pontchartrain Partners, LLC appeals the district court's grant of summary judgment to Z.E. Services, LLC in this action stemming from a maritime personal injury suit and the borrowed servant defense. Because the district court did not err, we AFFIRM.

## FACTS AND PROCEDURAL HISTORY

Jerode Garner was injured while working as a deckhand aboard a small tugboat, M/V MARY JANE, owned and operated by Pontchartrain Partners.[1] The tugboat was being used in a Grand Isle breakwaters project in Jefferson Parish, Louisiana. Pursuant to the project, Pontchartrain Partners had entered into a Service Agreement for Z.E. Services ("Zealous") to provide a captain to operate the tug on navigable waters off the coast of Louisiana. Captain Kevin Morgan was the Zealous employee provided to Pontchartrain Partners to operate the tug. Nick Dufrene was the project supervisor for Pontchartrain Partners.

Pontchartrain's work on the project involved transporting rocks from one end of the jobsite to the other on a barge hooked to the tug. Low Land Construction Company, Inc. was the owner of a living-quarters barge outfitted with an excavator that was also used on the project. The Low Land excavator operator would pick up the rocks from a large rock barge and transfer them to the barge hooked to the tug. Morgan would then navigate the tug to the unloading site before returning for more rocks.

On January 13, 2020, as the barge attached to the tug was being unloaded, Garner attempted to cross from the barge to the living-quarters barge. The barges began to separate, and Garner fell into the water. Garner filed suit against Pontchartrain Partners and Low Land, seeking damages for

---

[1] The merits of the underlying suit are not at issue here.

No. 22-30420

his alleged injuries based on various violations under maritime law by Pontchartrain Partners and Low Land.  Garner's suit, in part, claimed that the companies are vicariously liable for Morgan's negligence.  Garner's complaint was later amended to add Zealous as a defendant.

Zealous filed a cross-claim against Pontchartrain Partners, arguing that the contract between the parties "included a standard 'knock-for-knock' indemnity agreement whereby Pontchartrain agreed to defend and indemnify Zealous for injuries to any Pontchartrain employee."  Additionally, Zealous asserted that, if it were to be held strictly liable for any reason, it was claiming tort indemnity and contribution.  Pontchartrain Partners later filed a crossclaim against Low Land and Zealous, seeking indemnification and contribution for amounts it paid to Garner.

Zealous subsequently moved for summary judgment on the basis that Morgan was the borrowed employee[2] of Pontchartrain Partners at the time of the incident.  The district court agreed, and the motion was granted on June 13, 2022.  Pontchartrain Partners then filed this appeal.

## STANDARD OF REVIEW

We review the district court's grant of a motion for summary judgment de novo, viewing all facts and evidence in the light most favorable to the nonmoving party. *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016).  Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Credeur v. La. through Office*

---

[2] Also referred to as borrowed servant herein.

No. 22-30420

*of the Att'y Gen.*, 860 F.3d 785, 791 (5th Cir. 2017) (internal marks and citation omitted). We also review de novo a determination that an employee is a borrowed servant. *Gaudet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir. 1977); *see also Ruiz v. Shell Oil Co.*, 413 F.2d 310, 314 (5th Cir. 1969).

## DISCUSSION

The issue here is whether Morgan was Pontchartrain Partners' borrowed servant. Pontchartrain Partners asserts that the district court erred in granting summary judgment because a borrowed employee relationship could not be established under the nine factors set out in *Ruiz*. Those factors are:

> (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
>
> (2) Whose work is being performed?
>
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
>
> (4) Did the employee acquiesce in the new work situation?
>
> (5) Did the original employer terminate his relationship with the employee?
>
> (6) Who furnished tools and place for performance?
>
> (7) Was the new employment over a considerable length of time?
>
> (8) Who had the right to discharge the employee?
>
> (9) Who had the obligation to pay the employee?

*Mays v. Dir., Office of Workers' Comp. Programs*, 938 F.3d 637, 642 (5th Cir. 2019); *see also Ruiz*, 413 F.2d at 312-13.

Pontchartrain Partners asserts that these factors, as a whole, strongly weigh against a finding that Morgan was its borrowed employee. We disagree, as follows.

4

No. 22-30420

*(1) Control over employee*

This court has said that this factor is the "central question in borrowed servant cases." *Mays*, 938 F.3d at 642 ) (citation omitted); *see also Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447, 455 (5th Cir. 1980).

Pontchartrain Partners asserts that it "did not exercise authoritative direction and control" over Morgan. Instead, it argues that Morgan's day-to-day instruction came from Low Land Construction, and that Morgan himself determined how he navigated the tugboat or performed his work. Pontchartrain Partners also points to Morgan's deposition testimony agreeing that he was always a Zealous employee throughout his tenure on the project. Additionally, Pontchartrain Partners relies on Morgan's experience as a vessel captain as an indication that he required less supervision than, for example, a laborer.

Pontchartrain Partners cites *In re Suard Barge Services, Inc.*, No. 96-3185, 1997 U.S. Dist. LEXIS 18864,[3] at *11 (E.D. La. Nov. 25, 1997), as authority in its discussion of control, saying there was "no meeting of the minds" here to support a borrowed servant finding. Not only is *Suard* non-binding, but that court was referencing the third factor in which it found that "[t]here was no agreement—written or oral, implicit or explicit" between the two employers. *Id*. *Suard* is easily distinguished because there was an agreement or meeting of the minds here, as Pontchartrain Partners concedes pursuant to factor three.

Pontchartrain Partners conflates having control with the degree to which it was necessary to exercise control. Further, the question is not whether Morgan was an employee of Pontchartrain Partners, but rather

---

[3] 1997 WL 736693, at *4.

whether he was a borrowed employee of Pontchartrain Partners. Despite Morgan's testimony that he interacted most often with the excavator operator from Low Land (because their jobs intertwined), he repeatedly testified that Nick Dufrene from Pontchartrain Partners oversaw the operation. Dufrene held the daily safety briefings and provided daily instructions. Morgan also testified that he did not take any instructions from Zealous while at the Pontchartrain Partners' jobsite. Rather, Morgan said he was told by Zealous to pick up the tug, go to Grand Isle and work as directed by Pontchartrain Partners. Morgan said that Pontchartrain Partners controlled the entire job, including his portion.

Additionally, the Service Agreement said: "[Zealous'] services shall be administered and approved by a designated [Pontchartrain Partners'] employee." The agreement included a provision allowing Pontchartrain Partners to terminate the agreement for various reasons, including "unacceptable performance." The agreement also said that Zealous was "cautioned to disregard guidance pertaining to the interpretation of specific requirement to the contract or modifications to the contract, during the period of performance, from any source other than" Pontchartrain Partners.

Moreover, this court has previously addressed similar arguments. In *Melancon v. Amoco Production Co.*, 834 F.2d 1238 (5th Cir. 1988), this court concluded that, "[t]he fact that Melancon had specialized welding skills he utilized in most of his work and none of the Amoco personnel had similar welding expertise does not bar a finding of 'borrowed employee' status." *Id.* at 1245 (citation omitted). The same applies to Morgan's expertise and experience in operating a tugboat.

Accordingly, this factor weighs heavily in favor of a borrowed employee relationship.

*(2) Whose work being performed*

Pontchartrain Partners concedes that Morgan was performing its work. Thus, this factor weighs in favor of a borrowed employee relationship.

*(3) Agreement between employers*

Pontchartrain Partners concedes that there was a Service Agreement, discussed above, but disputes the effect of the agreement as it pertains to other factors as discussed herein. This factor weighs in favor of a borrowed servant relationship.

*(4) Acquiescence*

Pontchartrain Partners argues that this factor is neutral because Morgan testified that he was always an employee of Zealous, and his employment never transferred to Pontchartrain Partners. However, that is not the standard for acquiescence.

In *Melancon*, this court concluded that Melancon had acquiesced, saying that he knew when he began work at the new employer, knew what his work conditions would be, and made no complaints. *Id.*, 834 F.2d at 1246. In a more recent case, this court said: "The question is not whether [Morgan] agreed to become [Pontchartrain Partners'] employee but whether he was aware of his work conditions and chose to continue working in them." *Mays*, 938 F.3d at 645 (internal marks and citation omitted). This factor weighs in favor of a borrowed servant relationship.

*(5) Termination*

Pontchartrain Partners asserts that Zealous never terminated its relationship with Morgan, and this factor weighs against borrowed servant status.

This court has said: "This factor does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee'

doctrine." *Melancon*, 834 F.2d at 1246. "The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs." *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 618 (5th Cir. 1986). In *Melancon*, this court concluded that the lending employer's control was "nominal at most" while he worked for the borrowing employer. 834 F.2d at 1246. Here, Zealous' control over Morgan was also nominal at most. There is no evidence that Zealous was exercising any control over Morgan's daily performance or duties while Morgan was working on the Pontchartrain Partners' job.

This factor weighs in favor of a borrowed servant relationship.

### (6) Tools and place

Pontchartrain Partners concedes that this factor weighs in favor of a borrowed servant status but asserts it should be of little weight because, under the agreement, Zealous would not have been in a position to provide the materials or tools (the vessel and oil) needed for the job. We agree that this factor weighs in favor of a borrowed servant relationship.

### (7) Time period

Pontchartrain Partners argues that the three-month time period that Morgan worked as its captain was neither substantial nor insubstantial, and this factor should be neutral. We agree that it is neutral. *See Mays*, 938 F.3d at 646.

### (8) Right to discharge

Pontchartrain Partners characterizes Morgan's testimony as meaning he would voluntarily leave the job site if Pontchartrain Partners was unhappy with his work. Pontchartrain Partners argues, "[t]his voluntary undertaking does not translate to a right to terminate employment," and points to its own declaration that it did not retain any right to terminate Morgan.

That interpretation contradicts the Service Agreement, as quoted above, and the actual effect of the relevant provision. The agreement clearly provides that Pontchartrain Partners had the right to terminate Morgan as its borrowed employee. Pontchartrain Partners' perceived inability to terminate Morgan as an employee of Zealous has no bearing. This factor weighs in favor of a borrowed servant relationship.

*(9) Payment*

Pontchartrain Partners asserts that Zealous was responsible for paying Morgan, and this factor weighs against borrowed servant status. But, as the district court found, Morgan's daily rate was included in the contract price. The agreement said that Zealous would provide a captain to Pontchartrain Partners for $550 per day, "inclusive of all wages, per diem and insurances." At the time of the agreement, Morgan was making approximately $450 per day. Here, the payments were indirectly made to Morgan through Zealous but were based on the rate for a full day's work, plus per diem and insurance. This court has previously concluded that such payments are consistent with a borrowed servant relationship. *See Capps*, 784 F.2d at 618.

These factors overwhelmingly support the district court's ruling. Finally, Pontchartrain Partners asserts that summary judgment was inappropriate because there is a factual dispute as to whether Morgan was a borrowed employee. However, this court has repeatedly said that the issue of whether a relationship of borrowed employee exists is a question of law to be decided by the court, not the jury. *See Gaudet*, 562 F.2d at 357-58; *Ruiz*, 413 F.2d at 314. Further, Pontchartrain Partners "cannot generate a factual dispute merely by contesting the conclusion reached by the court, rather they must show that genuine disputes exist over enough determinative factual ingredients to make a difference in this result." *Gaudet*, 562 F.2d at 358. Pontchartrain Partners is unable to do so.

No. 22-30420

For these reasons, we AFFIRM.